*In re* J.B., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Leslie Blackwell, Respondent-Appellant).

First District (5th Division)  No. 1—88—1358

Opinion filed December 22, 1989.

Randolph N. Stone, Public Defender, of Chicago (Karen E. Tietz, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, William D. Carroll, and Diann Doppelt, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COCCIA delivered the opinion of the court:

After an adjudicatory hearing, respondent Leslie Blackwell was found to have neglected her minor son. At the dispositional hearing the trial court awarded the guardian *ad litem* custody of the child. The issue on appeal is whether the trial court's determination of neglect was against the manifest weight of the evidence.

On May 12, 1987, the Illinois Department of Children and Family Services (DCFS) filed a petition for adjudication of wardship of respondent's son, J.B., who was about seven years old at the time. The petition alleged that the child was neglected, in that respondent did not provide the care necessary for his well-being and that he was abandoned in violation of section 2—4(1) of the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 702—4(1) (now codified as Ill. Rev. Stat.

1987, ch. 37, par. 802—3(1))). At the temporary custody hearing, Donald Garrity of the DCFS Child Protection Division testified that the agency's hotline had received an allegation of cuts, bruises, welts, and sexual exploitation. Pursuant to an investigation, Garrity interviewed respondent. Initially, respondent denied that she had a son named J.B., but when Garrity pointed out that she had been receiving public aid for the child for the last seven years, respondent acknowledged that J.B. was her son. Respondent provided Garrity with several different explanations as to why J.B. was not living with her. Garrity subsequently learned that J.B. had been living with the Crawford family since September 1980, and that respondent had not had contact with J.B. since he was eight months old. Garrity asked the court to issue a "no contact" order, stating that just prior to the hearing and just outside of the courtroom, respondent was hostile and told him that she was going to do anything to get her child back. She then went over to J.B. and told him that she was going to find out where he lived and go over and get him.

Diane Crawford testified that J.B. had been in her custody for at least 6½ years. During this time respondent never visited her son. Based on this testimony the trial court entered a "no contact" order.

At trial Crawford testified that sometime prior to September 1980 her brother, respondent, and respondent's family, including J.B., moved in with her. In September 1980, respondent moved out, leaving J.B. with Crawford. J.B. was eight months old at the time. Crawford stated that she agreed to take care of J.B. "until [respondent] got herself together." However, respondent had not contacted J.B. since that time, nor had she provided money, food, or clothing for J.B. Crawford testified that she knew that respondent was receiving public aid for J.B., because she saw her brother with the public aid medical card. According to Crawford, respondent had contacted Crawford's mother several times over the past six years, but she had never contacted Crawford. She also indicated that J.B. considered her to be his mother, that she had enrolled him in school and that she had paid for his medical expenses over the years.

Respondent testified that in September 1980 she lived with the Crawford family and that she subsequently moved out in June 1981. At that time Crawford agreed to take care of J.B. until respondent found a place to live. About one year later, respondent returned to the Crawford residence only to find no one residing at that location. Respondent stated that since 1981 she had daily contact with Crawford's mother, that they would talk about J.B., and that she was told by Crawford's mother that she did not know where Crawford was

staying. Respondent testified that she gave money, food, clothing, and J.B.'s medical card to Crawford's brother. When questioned about a conversation she had with Garrity, she denied telling him that J.B. was not her son, but admitted that she lied when she told Garrity that J.B. only lived with her on the weekends. Respondent also stated that she received public aid for J.B. until May 1987.

At the dispositional hearing, Lewis Simon, a DCFS child welfare specialist, testified that a service plan had been provided to respondent in May 1987. The plan required that respondent determine what action was in the best interests of her son. Respondent had "mixed feelings" as to whether she wanted him to remain with the Crawfords or return home, but she decided that she wanted him to return. Pursuant to the plan respondent was also required to begin visiting the child and seek counseling. Simon was uncertain as to how often respondent had visited J.B. since the plan was developed, but he did testify that respondent attended her first counseling session in 1988, although Simon had not received any documentation from the counseling center that respondent had registered and attended sessions. Simon further testified that respondent was cooperative. He recommended that a guardian be appointed and that DCFS be given the right to place J.B.

In rendering its decision the trial court found as follows:

"Then considering the mother's recent, only recent attempts to begin the counseling and the visiting, there will be a finding of unwillingness as to the parents and that services are being offered the mother. Best interests of the minor Gary T. Morgan will be appointed guardian."

Respondent contends that the trial court's finding of unwillingness was against the manifest weight of the evidence in view of evidence that she wanted custody of her son, that she visited him weekly, and that she attended counseling sessions. Respondent reasons that a determination of her fitness as a parent should be based on her present progress and not on her past conduct.

■ In reviewing the trial court's findings we are guided by the rule of law in parental rights termination proceedings that requires a clear and convincing standard of proof. (See *In re Enis* (1988), 121 Ill. 2d 124, 134, 520 N.E.2d 362, 367; see also *Santosky v. Kramer* (1982), 455 U.S. 745, 769-70, 71 L. Ed. 2d 599, 617, 102 S. Ct. 1388, 1403.) The trial court's decision is entitled to great deference, and it shall not be reversed unless contrary to the manifest weight of the evidence. See *In re N.F.* (1989), 178 Ill. App. 3d 662, 666, 533 N.E.2d 952, 955.

■ Applying these standards to the instant case, we conclude that the trial court's finding of neglect and adjudication of the child as a ward of the court was proper. It is undisputed that respondent abandoned her son for about the first six years of his life, during which time she continued to accept public aid for the child. The person who cared for the child during this time testified that respondent never once visited him. Respondent testified that she returned to the caretaker's house one year after leaving her son only to find that no one was living at that location. Respondent then claimed that she had daily contact with the caretaker's mother who, according to her, did not know the whereabouts of her child. The caretaker testified that she fed, clothed, and paid for the child's medical expenses, while respondent testified that during those several years she gave the caretaker's brother money, food, and clothing for her son. The social worker who developed a service plan for respondent in 1987 was uncertain regarding how often respondent visited her son, as required by the plan. Although the social worker thought that respondent was attending counseling sessions, there was no documentation indicating that respondent had registered and attended the sessions on a regular basis. After reviewing this evidence, we conclude that the trial court's finding of parental neglect was supported by the constitutional dictate that in parental rights termination cases clear and convincing evidence will be required before parental rights may be terminated. (See *Enis*, 121 Ill. 2d at 134, 520 N.E.2d at 367; see also *Santosky*, 455 U.S. 769-70, 71 L. Ed. 2d at 617, 102 S. Ct. at 1403.) We likewise conclude that the trial court's decision was not against the manifest weight of the evidence. See *N.F.*, 178 Ill. App. 3d at 666, 533 N.E.2d at 955.

For the reasons stated, the judgment of the circuit court is affirmed.

Affirmed.

MURRAY, P.J., and LORENZ, J., concur.